LEE MYERS & O'CONNELL LLP
JOHN O'CONNELL      10715-0
 E-Mail: OConnell@lmoclaw.com
40 Grove Street
Wellesley, Massachusetts   02482
Phone: (617) 996-2500
Facsimile (954) 252-3818

O'CONNOR PLAYDON GUBEN & INOUYE LLP
A LIMITED LIABILITY LAW PARTNERSHIP
JEFFRE W. JULIANO     4930-0
 E-Mail: jwj@opgilaw.com
Pacific Guardian Center, 24th Floor
733 Bishop Street
Honolulu, Hawaii 96813
Phone: (808) 524-8350
Facsimile: (808) 531-8628

Attorneys for Plaintiff
GARRETT E. TEAGLE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| GARRETT E. TEAGLE,<br><br>　　　　　　Plaintiff,<br><br>　vs.<br><br>AQUAZONE, LLC, dba Aqua Zone Scuba & Snorkel Center and DEVON K. MERRIFIELD,<br><br>　　　　　　Defendants. | CIV. 19-00571-HG-KJM<br><br>PLAINTIFF'S FINAL PRE-TRIAL STATEMENT; EXHIBITS "A" and "B"; CERTIFICATE OF SERVICE<br><br>Pretrial Conference:<br>Date:  February 16, 2021<br>Time:  9:45 a.m.<br>Judge: Hon. Kenneth J. Mansfield<br><br>TRIAL:   March 30, 2021<br>PRESIDING: Hon. Helen Gillmor |

## PLAINTIFF'S PRE-TRIAL STATEMENT

**(1)     Party.**

Plaintiff Garrett R. Teagle (hereinafter "Teagle").

**(2)     Jurisdiction and Venue.**

The statutory basis of jurisdiction is subject matter jurisdiction under 28 U.S.C. § 1333(1).  This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.  Venue is proper in this district under 28 U.S.C. § 1391(b)(1) and (b)(2).  Both are undisputed.

**(3)     Substance of Action.**

This is a personal injury tort case governed by admiralty and maritime law. Plaintiff, while working as a crewmember and dive guide for Defendants, sustained a decompression injury with brain injury and various sequalae when conducting an emergency ascent when a dive participant signaled a loss of air. The vessel *Au Kai* was owned, operated and captained by the Defendants.  The vessel operated on the day was subject to Coast Guard regulations including but not limited to United States Coast Guard Sector Honolulu Work Instruction 31.

**(4)     Undisputed Facts.**

The following are undisputed facts, with select citations to specific evidence:

1.     On September 9, 2018, Plaintiff Teagle was a crew member and dive master employed by the Defendants for a scuba dive charter aboard the dive vessel *Au Kai*.

2.     Plaintiff Garrett Teagle worked as a member of the crew of the vessel *Au Kai* over 90% of the time while employed by Defendant Aquazone, LLC. "Q. So would it be a fair statement that he spent probably over 90 percent of his time either as crew on the boat or diving off the boat? A. I would -- yes, yes." *See*, Defendant Devon Merrifield Dep. at 51:4 to 51:7.

3.     Defendant Merrifield is the Managing Partner and an owner of Aquazone, LLC. *See*, Defendant Devon Merrifield Dep. at 8:16 to 9:7.

4.     The vessel *Au Kai* was operated by Defendants pursuant to a Certificate of Inspection ("COI") issued by United States Coast Guard Sector Honolulu ("USCG"). *See*, Defendant Devon Merrifield Dep. at 151:22 to 153:10.

5.     Compliance with the vessel's COI is mandated by 46 U.S.C. § 3313(a) ("During the term of a vessel's certificate of inspection, the vessel must be in compliance with its conditions[.]").

6.     Devon K. Merrifield is the owner of the vessel *Au Kai*. *See,* COI, p.1.

7.     The *Au Kai* COI requires a mandatory minimum crew of one master and one deckhand. *See,* COI, p.1.

8.    Enumeration of the minimum crew manning requirement in the *Au Kai*

COI is mandated by 46 U.S.C. § 8101(a) ("The certificate of inspection

issued to a vessel . . . shall state the complement of licensed individuals

and crew . . . necessary for safe operation[.]".

9.    The statute forbids operation of vessel without the required crew manning

requirements being met.  46 U.S.C. § 8101(d) ("A vessel to which this

section applies may not be operated without having in its service the

complement required in the certificate of inspection."

10.    The *Au Kai* COI further provides that "If the provisions of Work

Instruction 31 are met, the required deckhands may enter the water while

moored or at anchor during in-water passenger activities."  *See.* Merrifield

Dep. at 153:11 to 154:7; COI p.1.

11.    Work Instruction 31 ("WI 31") is a set of provisions also issued by USCG

Sector Honolulu, *see, id.* at 154:8-9 and Exh. 10 attached thereto.

12.    USCG regulations authorize inclusion of such provisions in a vessel's COI.

46 C.F.R. § 176.103 ("The certificate of inspection issued to a vessel

describes . . . the minimum manning requirements . . . and such other

conditions of operations as may be determined by the cognizant OCMI

[Officer in Charge, Marine Inspection].")

13. Under WI-31, it is the sole responsibility of the master of the vessel to ensure compliance with WI-31, ensure that crewmembers are familiar with and trained in written policies and procedures and that these safety policy and procedures are followed. "The master shall ensure all crewmembers are familiar and trained in the written policies and procedures as it relates to the reduced manning. In addition, it remains the sole responsibility of the master to ensure these policy and procedures are implemented and followed." *See,* WI 31 at page 4, paragraph 1.

14. Defendant Merrifield was the master of the vessel at the time of the incident. "Q. Were you considered to be the master of the vessel? A. Yes." *See,* Merrifield Dep. at Page 47:4 to 47:5.

15. On the day of the subject incident, in order to allow Plaintiff to leave the vessel while it was moored and enter the water to accompany its passengers' scuba diving, Defendants and the vessel had to be in compliance with WI 31. "Q. "So we agree in order to put Mr. Teagle in the water on the day of the incident, you had to be in compliance with Work Instruction 31, true?" A. "Yes". *See,* Merrifield Dep. at 154:24 to 155:2.

16. WI 31 requires that a vessel have a "well defined, written policy" on acceptable weather and sea conditions before allowing a deckhand in the

water, including currents; that the vessel must have "written plans, policies, and procedures" on crew response to emergencies; and that "each crewmember must have training in the vessel operating policies and procedures and demonstrate a clear understanding of them." *See,* WI 31 at p. 2-3, paragraphs 2-3, 5-6.

17. Defendants' written policies and procedures for the vessel *Au Kai* in effect on the day of the subject incident did not include a provision defining acceptable weather and sea conditions as required by WI 31; Plaintiff Teagle had not been given a copy of the policies and procedures before the subject incident as required by WI 31; nor had he ever been trained on them prior to the incident as required by WI 31. *See,* Merrifield Dep. at 147:16 to 150:12, 159:8-11.

18. Aquazone, LLC. had a Safe Operating Procedures Manual for crewmembers. "Q.   Was there a manual for crew.  A.  Nothing more than the SOP.  Q.   I assume you mean standard operating procedures? A. Yes. Q.  Or do you mean safe operating procedures?  A.   Safe operating procedures." *See*, Defendant Devon Merrifield Dep. 51:10 to 51:16.

19. The Safe Operating Procedures dictated how to conduct a safe dive and provided reference to emergency procedures.  "Q. What are safe operating procedures for AquaZone? A.   Well, the manual that I wrote states that --

how to conduct a dive as I see as safe, emergency procedures, numbers to call, anything that might affect anything we do." *See*, Defendant Devon Merrifield Dep. at 52:10 to 52:14.

20.  The Safe Operating Procedures manual was never given to Garrett Teagle. "Are you aware that Lauren did not provide him with one? A.  I did.  I knew that.  *See*, Defendant Devon Merrifield Dep. at 56:12 to 56:14.

21.  The Defendants never performed any safety drills, emergency drills or emergency procedures with the Plaintiff Garrett Teagle.  "Q.  What about safety drills? A.  I don't believe he was part of any safety drills."… "Q. Okay.  So is it a fair statement that no emergency procedures were ever done with Garrett Teagle?     A.  Yes."… "Q.  So is it a fair statement that the safety drills were never practiced by employees at AquaZone?  A. Yes.  Q.  And, therefore, Garrett Teagle was never involved in safety drill practice; true? A.  Yes.  *See*, Defendant Devon Merrifield Dep. at 69:21 to 71:11.

22.  The dive charter included three paying customers, William Redpath, Martin Durano and Richard Wilson.  (Participant Booking Details, Defendant Bates 0117-0120).

23.  The incident dive occurred at the shipwreck dive site off of Waikiki known as YO-257, with a bottom depth of approximately 90 feet below the surface.

24.  During the dive and prior to the incident, Dr. Redpath observed a noticeable ocean current requiring strenuous use of his legs.  *See*, Redpath Dep. at 21:09 to 21:18.

25.  Plaintiff Teagle and Dr. Redpath began an emergency ascent to the surface, without conducting necessary safety stops.  *See*, Redpath Log Entry – Emergency Ascent, PL Bates GET 1289.

**(5)   Disputed Facts.**

26.  Whether Plaintiff was employed by Defendant Aquazone, LLC, as a seaman within the meaning of the Jones Act, 46 U.S.C. § 30104.

27.  Whether Defendants' non-compliance with the vessel *Au Kai* COI, 46 U.S.C. § 3313, 46 U.S.C. § 8101, and/or 46 C.F.R. § 176.103 played any part, however slight, in causing Plaintiff's alleged injuries.

28.  Whether Garrett Teagle vomited aboard the vessel Au Kai immediately after boarding the vessel and was visibly fatigued.

29.  Whether the failure to provide oxygen and/or decompression treatment played any role, however slight, in the injury.

30.     The parties dispute the nature of the ascent of Dr. Redpath and Plaintiff

        Teagle.

31.     Subsequent to the incident, Defendant Merrifield changed the Safe

        Operating Procedures in order to let an employee know that they did not

        have to dive if they were not feeling well. "Q. What did he tell you? A.

        He thought it better -- it would probably be worded better if I had a

        statement in there that allowed employees to know that they don't have to

        dive if they're not feeling well." *See*, Defendant Devon Merrifield Dep. at

        Page 54:10 to 54:16.

32.     It was feasible to advise crew members in the Safe Operating Procedures

        that they did not have to dive if they were not feeling well. "Q. Would it

        have been feasible for you to include that additional language in the prior

        version? A. Please note I don't -- didn't understand the -- the specificity of

        it. Q.   But you could've done it?  It was feasible; true? A.  Yes." *See*,

        Defendant Devon Merrifield Dep. at 54:22 to 55:6.

33.     During the dive and prior to the incident, Dr. Redpath observed a

        noticeable ocean current requiring strenuous use of his legs. "Q.  Was the

        current on the day of the incident stronger than the current on 9/11/2017 - -

        when you were diving the site?  A.  Yes.  Q  How so?  A.  Oh, I think

        much stronger.  It was quite noticeable.  Q.  How would you describe the

current?  A.  Well, we had to swim or use our legs quite - - fairly strenuously against it."  *See*, Redpath Dep. at 21:09 to 21:18.

34.   During the dive and prior to the incident, Mr. Wilson observed the current growing stronger as the divers approached the YO-257 dive site.  "Q.  How would you describe the current that day?  A.  When we first started down, it - - it seemed okay, but when we got down, it seemed to get a little stronger as we got closer to the San Pedro, to the Y2 - - the YO-257.  Q. All right.  Would you consider it a strong current?  A.  Yes.  A guesstimate would be probably just under a knot."  *See*, Wilson Dep. at 22:05 to 22:11.

35.   Approximately seven minutes into the dive, one of the customer divers, later identified as Dr. William Redpath, began experiencing air starvation and decided to draw Plaintiff's attention.  "Q.  What happened?  A.  Well, I was suffering, basically, from what I recall, air starvation.  It's never happened to me before, and I've been at that depth lots of times.  And after about a minute or two, I thought I should bring it to the divemaster's attention.  It wasn't something that came on suddenly, it was something I was aware of, and I was thinking about just slow down, slow your breathing, and -- and things will sort themselves out.  And then I thought really what I wanted to do was to just go up 30 feet or so, just get an atmosphere up, and I felt that that would fix things.  And so I remember

drawing the divemaster's attention." ; "Q.  Air starvation is what?  A. Well, just a feeling that I wasn't getting enough air. It's the sort of thing you would get if you were climbing a steep slope.  After 2 or 3 minutes, you'd probably start to get a little short of breath and stop and take in some air, same sort of thing."  *See*, Redpath Dep. at 25:12 to 25:23; 26:10 to 26:15.

36.    Dr. Redpath reached out in front to touch Plaintiff Teagle and signal that he was having an issue breathing.  "Q.  Now, we know that you were at 90-foot depth, so you couldn't talk with the divemaster, so what did you do?. . . A.  Yes, yes. Well, I -- what I did was he was swimming in front of me, and I reached out to touch him to draw his attention to me.  Q.  Then what happened?  A.  And then he turned around, and I indicated -- I did my best to indicate to him that I was having an issue breathing.  Now, I didn't give him the signal that I was out of air, I did not use the throat cut signal." ;  Q. Then let me ask the question just for signs. Is it a fair statement that you had given Mr. Teagle the sign that you were having problems breathing at 90-foot depth?  A.  Yes."  *See*, Redpath Dep. at 26:23 to 27:12, and 34:06 to 34:09.

37.    Dr. Redpath continued by explaining he used his index finger to point out where the problem was, specifically pointing to his regulator.  "A. Now,

everything -- I indicated to him and -- there's a system where we indicate that there's a problem, and then you use your index finger to point out where the problem was.  And I'm not sure, of course, what the divemaster's interpretation of that was, but I indicated that there was a problem by pointing at my regulator.  That was my way of saying the best I could that I had an issue with breathing." *See*, Redpath Dep. at 27:14 to 27:20.

38.   Plaintiff Teagle offered his octopus to Dr. Redpath, who accepted it.  "Q. Then what did you do?  A.  Well, he then offered me his octopus.  Now, I -- it wasn't really my preferred solution, but it wasn't a bad idea and I could see exactly -- I mean, he did all he would -- would be expected to do in the circumstances, offered me his regulator, so I took it." *See*, Redpath Dep. at 29:01 to 29:05.

39.   Dr. Redpath placed the regulator in his mouth and then attempted to purge the regulator by manually blowing the water out.  "A.  I purged my -- I purged the regulator when I put it in my mouth by taking a deep breath from my own regulator, but I just didn't blow out enough." ;  "A.  And the way I chose was just simply when I got Mr. Teagle's regulator, his octopus in my mouth, I simply blew very hard." *See*, Redpath Dep. at 29:06 to 29:08 and 30:05 to 30:07.

40.   Dr. Redpath inhaled a significant amount of water and air.  "A. . . . When I
took my first inhalation, I inhaled a significant amount of water with the
air, which was, of course, highly problematic."  *See*, Redpath Dep. at 29:08
to 29:10.

41.   Plaintiff Teagle then held the regulator in Dr. Redpath's mouth and pressed
the purge valve.  "Q.  Okay.  And did you attempt to purge the regulator?
A.  No.  Actually, after I - - well, the purge that I used was just breathing
out very hard, I didn't press the valve.  But Mr. Teagle did, he held the
thing in my mouth and he pressed the purge valve."  *See*, Redpath Dep. at
30:15 to 30:19.

42.   At this time, Plaintiff Teagle and Dr. Redpath were connected by virtue of
Dr. Redpath having Plaintiff's regulator in his mouth.  "Q.  And what
happened next?  A.  We simply made our way up.  Q.  And how did you do
that?  A.  Well, we were together, of course.  I mean, we were drawn
together, basically, I had his octopus in my mouth."  *See*, Redpath Dep. at
32:13 to 32:17.

43.   The parties dispute the nature and scope of Plaintiff's injuries.  Plaintiff
Teagle treated first at Queens Medical Center in Honolulu and was sent for
immediate hyperbaric recompression treatment on the same day at
University Health Partners Hawaii.  When Plaintiff's symptoms did not

resolve, he traveled to West Jefferson Medical Center in New Orleans, LA to seek specialized treatment with Dr. Keith Van Meter, who specializes in Diving and Hyperbaric Medicine.  Treatments included 11 hyperbaric oxygen therapy treatments over a two-week period.  Dr. Van Meter observed significant deficits and recommended a visit to Dr. Susan Andrews for neuropsychological evaluation and psychometric testing.  Dr. Andrews observed significant functional deficits including Neurocognitive Disorder Due to Decompression Sickness, Adjustment Disorder, and Somatic Symptom Disorder.  Plaintiff has continued to treat with his primary care provider, visited cardiologists for testing, and undergone counseling related to his injuries.

44.   The parties dispute the value of Plaintiff's damages in this case.

**(6)   Relief Sought.**

1.   Economic and non-economic damages for Plaintiff Teagle's physical and cognitive injuries.

2.   Maintenance and cure.

3.   Attorneys' fees and costs as permitted by law.

4.   Such other relief as this Court may deem just and equitable under the circumstances.

**(7)    Points of Law.**

If the evidence at trial shows Plaintiff was employed as a seaman and

Defendants' non-compliance with any of the statutes and regulations cited above

played any part, however slight, in causing Plaintiff's alleged injuries, negligence

per se will be established and the defense of comparative fault will be barred as a

matter of law.  *See, Kernan v. American Dredging Co.*, 355 U.S. 426, 431 (1958)

(violation of a statute or Coast Guard regulation that causes injury or death of an

employee creates liability "in the absence of any showing of negligence");

*MacDonald v. Kahikolu Ltd.*, 442 F.3d 1199, 1203 (9th Cir. 2006) (same) (also

discussing "however slight" causation standard); *Fuszek v. Royal King Fisheries,*

*Inc.*, 98 F.3d 514, 517 (9th Cir. 1996) ("In light of the above, we hold that the

district court erred by reducing Fuszek's damage award for comparative

negligence.  The ship was in unexcused violation of a Coast Guard safety

regulation[.]");  *Barnes v. Sea Hawaii Rafting, LLC,* Civ. No. 13-00002 ACK-

RLP (D.Haw. Dec. 22, 2015). 2015 U.S. Dist. LEXIS 171804 (granting

Plaintiff's Motion for Summary Judgment in part, finding negligence per se and

holding, *inter alia*, "The burden to establish legal causation under the Jones Act

is minimal . . . Defendants' claim regarding the leaky fuel line does not contradict

[Plaintiff's] evidence that the explosion was caused at least in part by

Defendants' failure to adhere to Coast Guard Regulations"); *Roy Crook and Sons,*

*Inc.,* 778 F.2d 1037, 1043 (5th Cir. 1986) (violation of manning statute, 46 U.S.C. § 8101, established negligence per se and barred comparative fault) ("Because we find that the manning statute [46 U.S.C. § 8101] is intended for the benefit of crew members, Section 53 of the FELA bars a consideration of Captain Allen's comparative negligence."); *Reyes v. Vantage S.S. Co., Inc.*, 558 F.2d 238, 242 (5th Cir. 1977) ("*Reyes I*") ("[t]he law is well established that violations of a statute which is intended to protect the class of persons to which the plaintiff belongs . . . is negligence in itself") (brackets by the court); *Reyes v. Vantage S.S. Co., Inc.*, 609 F.2d 140, 143 (5th Cir. 1980) ("*Reyes II*") ("The failure to follow any Coast Guard regulation which is a cause of an injury establishes negligence per se") (emphasis by the court); 1B <u>Benedict on Admiralty</u> § 26 Violation of Statutes and Regulations ("Thus, under the Jones Act, 'the common-law concepts of foreseeability and risk of harm are not applicable where the employer violates a federal statute or a Coast Guard regulation, if such conduct in whole or in part caused the injury"), citing *MacDonald, supra,* 442 F.3d at 1203 (9th Cir. 2006).

**(8)    Previous Motions.**

On February 4, 2021 Defendants filed an Objection to Subpoena to Produce Documents Directed to Testifying Expert The Neal Group International, Inc.  Defendants cite protections for a Fed.R.Civ.P. 26(a)(2)(B) testifying expert under: Fed.R.Civ.P. 26(b)(4)(B); Fed.R.Civ.P. 26(b)(4)(C); attorney-client

privilege, work-product privilege/doctrine, trial preparation privilege/doctrine; and protection of information unrelated to the preparation of the disclosed report prepared the Fed.R.Civ.P. 26(a)(2)(B) testifying expert The Neal Group International, Inc.

**(9)    Witnesses to be Called.**

1.    Garrett Teagle, c/o counsel, Lee, Myers & O'Connell, LLP, 40 Grove Street, Wellesley, MA 02482.  Mr. Teagle is the Plaintiff in this case and will testify regarding the facts and circumstances surrounding the September 9, 2018 incident; his physical and cognitive condition and abilities prior to and following the incident; his medical treatments; and his damages.

2.    Devon Merrifield, c/o counsel, Normand R. Lezy, Cox, Wootton, Lerner, Griffin & Hansen LLP, Honolulu, HI.  Mr. Merrifield is a Defendant in this case and will testify regarding the facts and circumstances surrounding the September 9, 2018 incident; management, ownership and operation of Defendant Aquazone and its vessels; duties of a vessel master; operating rules, regulations and safety and other procedures; operating certifications and endorsements; hiring and training of Plaintiff Teagle; incident reports; and PADI diving standards and procedures.

3.     Lauren Kesecker.  Ms. Kesecker was the shop supervisor on the day of the
incident.  She will testify to her conversations and communication with
Plaintiff Teagle before and after the incident; lack of provision of Safe
Operating Procedures; her observations of Plaintiff's condition and
abilities before and after the incident; and her observations of Plaintiff as
an employee of the Defendants.

4.     Dr. William Redpath.  3486 Goodrich Road, Nanoose Bay, British
Columbia, Canada.  Dr. Redpath was a customer/diver on the day of the
incident and experienced a regulator and air-delivery failure, leading to the
emergency rapid ascent with Plaintiff Teagle.  Dr. Redpath will testify
regarding the facts and circumstances of the incident; his selection of
Defendant Aquazone for the dive; diving conditions and currents on the
day and area of the incident; the condition of his dive equipment; causes of
the regulator failure and rapid emergency ascent; his observations of
Plaintiff Teagle's condition before and after the incident, while traveling
between dive sites, and during transportation to and from his hotel; and his
observations of, and conversations with, Defendant Merrifield during the
entire course of the dive charter.

5.     Richard Wilson.  520 Eaglewood Court, Qualicum Beach, BC V9K 0A3.
Mr. Wilson was a customer/diver on the day of the incident.  Mr. Wilson

will testify regarding the facts and circumstances of the incident; his

selection of Defendant Aquazone for the dive; diving conditions and

currents on the day and area of the incident; his observations of the rapid

emergency ascent from his vantage point during the dive; observations of

Plaintiff Teagle's condition before and after the incident, while traveling

between dive sites, and during transportation to and from his hotel; and

observations of the other divers and of Defendant Merrifield before and

after the incident.

6.   Martin Durano.  Address unknown.  Mr. Durano was a customer/diver on

the day of the incident.  Mr. Durano will testify regarding the facts and

circumstances of the incident; his selection of Defendant Aquazone for the

dive; diving conditions and currents on the day and area of the incident; his

observations of the rapid emergency ascent from his vantage point during

the dive; observations of Plaintiff Teagle's condition before and after the

incident, while traveling between dive sites, and during transportation to

and from his hotel; and observations of the other divers and of Defendant

Merrifield before and after the incident.

7.   Kathleen Mil.  Address currently unknown.  Ms. Mil is Plaintiff's friend

and neighbor.  She will testify to completing a PADI Incident Report after

the incident occurred; her observations of Plaintiff Teagle before and after

the incident; and her discussions with Plaintiff Teagle concerning the

incident.

8.      Carla Brown, 7930 Flat Shoals Drive, Columbus, GA 31904.  Carla Brown

is Plaintiff's mother and will testify regarding Plaintiff Teagle's physical

and cognitive condition and ability prior to and following the incident; his

medical care; limitations imposed by the injuries; the impact on Plaintiff's

career and professional aspirations; his damages, and the nature and scope

of the impairment and injuries.

**Plaintiff's Treating Medical Providers:**

9.      Keith Van Meter, MD, Board-Certified in emergency medicine with a

subspecialty board certification in Diving and Hyperbaric Medicine, West

Jefferson Medical Center, 1101 Medical Center Boulevard, Marrero, LA

70072.  Dr. Van Meter is expected to give opinion testimony consistent

with his expert disclosure.  The reason and basis for his opinion and

testimony includes his treatment of Plaintiff after the incident; review of

Plaintiff's medical records, physical examinations, hyperbaric treatments,

transthoracic echocardiogram (TTE) imaging results; and his professional

knowledge, training and experience.  He will also testify to Plaintiff's

diagnosis; procedures and tests performed on Plaintiff; other reports

reviewed regarding the care and treatment rendered to Plaintiff; and the

nature and extent of Plaintiff's injuries.  Dr. Van Meter is also expected to testify in accord with Plaintiff's medical records, previously obtained by the Defendants pursuant to Deposition on Written Questions, taken by the Defendants on March 3, 2020.  He is expected to testify from notes, records, scan and imaging reports, billing records, and other reports of the care and treatment of Plaintiff.

10.    Edmund Kerut, MD, Cardiologist, West Jefferson Medical Center, 1101 Medical Center Boulevard, Marrero, LA 70072.  Dr. Kerut is expected to give opinion testimony consistent with his expert disclosure.  The reason and basis for his opinion and testimony includes his treatment of Plaintiff after the incident; administration of a transthoracic echocardiogram (TTE) to Plaintiff; review of Plaintiff's medical records, physical examinations, and his professional knowledge, training and experience.  He will also testify to Plaintiff's diagnosis; procedures and tests performed on Plaintiff; other reports reviewed regarding the care and treatment rendered to Plaintiff; and the nature and extent of Plaintiff's injuries.  Dr. Kerut is also expected to testify in accord with Plaintiff's medical records, previously obtained by the Defendants pursuant to Deposition on Written Questions, taken by the Defendants on March 3, 2020.  He is expected to testify from

notes, records, scan and imaging reports, billing records, and other reports of the care and treatment of Plaintiff.

11.   Susan R. Andrews, Ph.D., Clinical Neuropsychologist, 3925 North I-10 Service Road, West, Suite 224, Metairie, LA 70002.  Dr. Andrews is expected to give opinion testimony consistent with her expert disclosure. The reason and basis for her opinion and testimony includes her treatment of Plaintiff after the incident; neuropsychological evaluation and psychometric testing; review of Plaintiff's medical records, physical examinations, and her professional knowledge, training and experience. She will also testify to Plaintiff's diagnosis; the results of the two-day neuropsychological evaluation and psychometric testing; other reports reviewed regarding the care and treatment rendered to Plaintiff; and the nature and extent of Plaintiff's injuries.  Dr. Andrews is also expected to testify in accord with Plaintiff's medical records, previously obtained by the Defendants pursuant to Deposition on Written Questions, taken by the Defendants on February 24, 2020.  She is expected to testify from notes, records, billing records, and other reports of the care and treatment of Plaintiff.

12.   William Lahouse, M.D., Internal Medicine Specialist and Plaintiff's primary care physician, Internal Medicine Associates of Columbus, 1942

North Avenue, Columbus, GA 31901.  Dr. Lahouse is expected to give opinion testimony consistent with his expert disclosure.  The reason and basis for his opinion and testimony include his treatment both before and after the incident; review of Plaintiff's medical records, physical examinations, continuous treatment provided; and his professional knowledge, training and experience.  He will testify to Plaintiff's diagnosis; other records and reports reviewed regarding the care and treatment rendered to Plaintiff; and the nature and extent of Plaintiff's injuries.  Dr. Lahouse is also expected to testify in accord with Plaintiff's medical records, previously obtained by the Defendants pursuant to Deposition on Written Questions, taken by the Defendants on March 6, 2020.  He is expected to testify from notes, records, scan and imaging reports, billing records, and other reports of the care and treatment of Plaintiff.

13.   Mohammed Pathan, MD, Clinical Neuropsychologist, River City Neurological Associates, 2101 North Avenue, Columbus, GA 31904.  Dr. Pathan is expected to give opinion testimony consistent with his expert disclosure.  The reason and basis for his opinion and testimony includes his treatment of Plaintiff after the incident; administration of an electroencephalogram (EEG) to Plaintiff; review of Plaintiff's medical

records, physical examinations, and his professional knowledge, training

and experience.  He will also testify to Plaintiff's diagnosis; EEG testing

performed on Plaintiff; other reports reviewed regarding the care and

treatment rendered to Plaintiff; and the nature and extent of Plaintiff's

injuries.  Dr. Pathan is also expected to testify in accord with Plaintiff's

medical records, previously disclosed as Plaintiff Bates GET 1259-1266.

He is expected to testify from notes, records, scan and imaging reports,

prior brain MRI scans, billing records, and other reports of the care and

treatment of Plaintiff.

14.   Charlene Johnson, LPC, EdD, NCC, Licensed Professional Counselor with

Transformed Living Counseling Services.  Dr. Johnson is expected to give

opinion testimony consistent with her expert disclosure.  The reason and

basis for his opinion and testimony includes her counseling treatment of

Plaintiff after the incident; review of her counseling records; and her

professional knowledge, training and experience.  She will also testify to

other reports reviewed regarding the care and treatment rendered to

Plaintiff; and the nature and extent of Plaintiff's injuries and cognitive

deficits.  Dr. Johnson is also expected to testify in accord with Plaintiff's

medical records, previously disclosed as Plaintiff Bates GET 1178-1188.

She is expected to testify from notes, records, and other reports of the care and treatment of Plaintiff.

**Plaintiff's Expert Witnesses:**

1.  Robert W. Sanders, MD, FACEP FUHM, 2602 Baycrest Drive, Houston, TX 77058, is expected to give opinion testimony consistent with his expert report.  The basis for his opinion and testimony are referenced in his report, and includes review of Plaintiff Teagle's medical records, incident reports, video of the incident, transcripts of deposition testimony, discovery responses, dive machine data printouts, and his professional knowledge, training, and experience.

2.  Jan C. Weber, PADI Master Instructor and Instructor Development Course Staff Instructor, P.O. Box 4881, Kailua Kona, HI 96745, is expected to give opinion testimony consistent with her expert report.  The basis for her opinion and testimony are referenced in her report, and includes review of statements made concerning the incident, Defendant Merrifield's certifications, credentials and deposition testimony, incident reports, video and other communication concerning the incident, United States Coast Guard Work Instruction 31, dive profile data, the 2018 PADI Instructor Manual, PADI Recreational Dive Planner, and her professional knowledge, training and experience.

**(10)    Exhibits, Schedules and Summaries**

Please see the attached Exhibit "A" (Plaintiff's Exhibit List) and

Exhibit "B" United States Coast Guard Sector Honolulu Work Instruction 31.

**(11)    Further Discovery or Motions**

Pursuant to the parties' February 2, 2021 Stipulation to Continue

Discovery Deadline (ECF #74), Defendants issued a Notice of Taking

Depositions Upon Written Interrogatories and records subpoenas to Plaintiff's

former and current employers, with deposition dates of February 10, 2021.

Additionally, pursuant to Stipulation (ECF #74), Plaintiff will take the

Deposition Upon Written Interrogatories and records subpoena on Defendants'

expert, The Neal Group International, Inc., with a deposition date of February 12,

2021.

**(12)    Stipulations.**

A Stipulation for Remote Deposition Protocol was filed on August 27,

2020 (ECF #44).

There may be a stipulation as to the authenticity and admissibility of

medical records and past medical bills of Plaintiff Teagle.

**(13)    Amendments, Dismissals.**

None Requested.

**(14)   Settlement Discussion.**

The Court previously continued the December 15, 2020 Settlement Conference at the request of the parties.  This case is now scheduled for a Settlement Conference before Magistrate Judge Kenneth J. Mansfield, on March 4, 2021, with Settlement Conference Statements due by February 25, 2021.  Plaintiff's position is that the case is ripe for settlement discussion. Plaintiff remains willing to discuss settlement in good faith.

**(15)   Agreed Statement.**

A partial agreed statement is feasible and desired.

**(16)   Bifurcation, Separate Trial of Issues.**

None requested.

**(17)   Reference to a Master or Magistrate Judge.**

Not requested.

**(18)   Appointment and Limitation of Experts.**

Not requested.

**(19)   Trial.**

A non-jury trial is set to commence March 30, 2021 before the Honorable Helen Gillmor.

**(20)   Estimate of Trial Time.**

The trial is scheduled for eight (8) days.  Plaintiff Teagle estimates his

case-in-chief to take four (4) trial days.

**(21)   Claims of Privilege or Work Product.**

None in connection with preparing this Pretrial Statement.

**(22)   Miscellaneous.**

1.      Whether the trial will be conducted by Teleconference.

2.      Whether remote live testimony conducted through Zoom videoconference

of witnesses will be permitted at trial.

DATED:  Honolulu, Hawaii, February 9, 2021.

/s/  John T. O'Connell
JOHN T. O'CONNELL
JEFFRE W. JULIANO
Attorneys for Plaintiff Garrett Teagle